United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8

IN THE UNITED STATES DISTRICT COURT

9

FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11    POORE,                                    No. C03-04115 MJJ

12              Plaintiff,                       **ORDER GRANTING DEFENDANTS'**
                                                 **MOTION FOR SUMMARY JUDGMENT**
13         v.

14    ALAMEIDA ET AL,

15              Defendants.
      _____/
16

17                          **INTRODUCTION**

18         Before the Court is former director of the California Department of Corrections  ("CDC")

19    Edward J. Alameida, Jr.,  former acting director of the CDC Law Enforcement and Investigations

20    Unit ("LEIU") Steven Moore, and former warden of San Quentin Prison J.S. Woodford's

21    (collectively "Defendants") Motion for Summary Judgment on Christopher Poore's ("Plaintiff")

22    claim under 42 U.S.C. § 1983.[1]  Plaintiff opposes the motion.  For the following reasons, the Court

23    **GRANTS** Defendants' Motion for Summary Judgment.

24                          **BACKGROUND**

25    A.    **Factual Background**

26         Plaintiff is currently a condemned prisoner on death row at San Quentin State Prison ("San

27    Quentin").  In August of 1997, Plaintiff was transferred from Corcoran State Prison to Pelican Bay

28    State Prison's ("PBSP") Facility A.  While at PBSP, Plaintiff was involved in several prison gangs

---

[1]Docket No. 17, filed on July 1, 2005.

**United States District Court**

For the Northern District of California

1   including the Aryan Brotherhood Prison Gang.  In February and March of 1999, Plaintiff received

2   two rule violation reports for conspiracy to commit murder after officials discovered Plaintiff

3   conspired to stab members of a rival prison gang.  Defendants allege that while at PBSP, Plaintiff

4   gained the reputation of a "shot caller" or director of on-going gang violence and stabbing assaults

5   occurring in Facility A.  (*See* Declaration of A. Cattermole in Support of Defendants' Motion for

6   Summary Judgment ("Cattermole"), Ex. D, AGO-051, Ex. E, AGO-231.)  Following segregation and

7   an investigation, Plaintiff was notified that information gathered by prison officials established that

8   he was the leader of a racially segregated gang composed of white inmates.  (Cattermole, Ex. E,

9   AGO-231-232, Ex. H, AGO-255.)  Subsequently, in February of 1999, following the investigation

10  that discovered Plaintiff's leadership of the gang, the LEIU validated that Plaintiff was an associate

11  of the Aryan Brotherhood.  (Cattermole, Ex. G., AGO-249.)

12          To support Plaintiff's validation, the LEIU specifically relied on three pieces of evidence.

13  First, the LEIU cited a prison form establishing that Plaintiff attempted to circumnavigate prison

14  regulations while attempting to correspond with a member of the Aryan Brotherhood at another

15  institution.  (Cattermole, Ex. C.)  The second source upon which the LEIU relied was a confidential

16  memorandum dated January 4, 1999, which described Plaintiff's role as a "shot caller" of certain

17  gang assaults and homicides that took place in Facility A of PBSP.  (Cattermole, Ex. B, Ex. D,

18  AGO-055-056.)  The third source was an informational form indicating that Plaintiff harbored names

19  and addresses of inmates known to be members of the Nazi Low Riders and Aryan Brotherhood

20  gangs.  (Cattermole, Ex. D.)  In March of 1999, Plaintiff was paroled.[2]  Plaintiff's parole was

21  conditioned upon not associating with gang members or participating in gang activity.  (Cattermole,

22  Ex. F, AGO-247.)  Shortly after being released, Plaintiff committed murder.

23          During Plaintiff's criminal trial for that murder, witnesses testified about the nature of the

24  murder.  These witnesses testified that they were told by Plaintiff that the murder was a "hit" ordered

25  by the Aryan Brotherhood.  Additionally, Plaintiff admitted to detectives that "upstate had ordered

26  the victim taken care of."  (Cattermole, Ex. C, AGO-024-040.)  While in county jail, awaiting his

27  murder trial, Plaintiff continued his gang activity, which included altercations with other inmates,

28

[2]  In June of 1999, Plaintiff's parole was placed on hold.  (Cattermole, Ex. B, AGO-003.)

possession of weapons, and the solicitation of the murder of a witness in his criminal trial.  Plaintiff also told county correctional staff that he was a ranking member of the Aryan Brotherhood. (Cattermole, Ex. C, AGO-041, Ex. I, AGO-260.)  In February of 2002, Plaintiff was sentenced to death and placed in custody of the warden at San Quentin.

Condemned inmates at San Quentin have either Grade A or Grade B status.  Grade B status is more restrictive than Grade A status.  Inmates who pose little or no security risks are classified as Grade A.  Those inmates who threaten security and the safety of other inmates are classified as Grade B.  Grade B inmates have a high escape risk, potential for violence, and discipline issues.  Inmates classified as Grade B are housed in San Quentin's Adjustment Center and do not enjoy the same privileges Grade A inmates enjoy.  For example, Grade B inmates cannot make personal telephone calls or receive contact visits with outside individuals; are allowed ten hours in the exercise yard per week, as opposed to the forty-two hours permitted to Grade A inmates; are allowed forty-five dollars per month to purchase additional food, compared to the one hundred and eighty dollars per month for Grade A inmates; are allowed only one thirty-pound bag of food from outside of the prison per year, as opposed to four thirty-pound bags per year Grade A inmates receive; are unable to possess typewriters, tape-players, or water heaters; may not purchase razors from outside sources; and, are housed in different facilities.  A review of an inmate's Grade B classification occurs every ninety days.

Upon entering San Quentin, Plaintiff underwent an initial review before the San Quentin United Classification Committee and was classified as a Grade B inmate because of his February 1999 validation as an associate of the Aryan Brotherhood by the LEIU.[3]  The Classification Committee also based Plaintiff's Grade B classification on two new prison informational forms compiled by prison staff.  One informational form, dated March 27, 2002, noted that a correctional counselor contacted the county jail and confirmed that Plaintiff was involved in gang activity while incarcerated there.  That same informational form noted that Plaintiff had already received a rules violation report at San Quentin for possession of a weapon.  (Cattermole,  Ex. G, AGO-250, Ex. I,

---

[3] Plaintiff's previous validation by the LEIU was confirmed and documented in an informational form dated March 28, 2002, written by the San Quentin Institutional Gang Investigator.

United States District Court

For the Northern District of California

1  AGO-260.)

2       On April 10, 2002, Plaintiff filed an inmate appeal challenging his February 1999 gang

3  validation.  On June 5, 2002, the San Quentin Institutional Gang Investigator ("IGI"), in Plaintiff's

4  presence, reviewed the documents used to validate Plaintiff as a member of the Aryan Brotherhood,

5  and explained to Plaintiff that the institution felt the documents were reliable and sufficient to

6  validate him as a gang member.  On July 16, 2002, San Quentin denied Plaintiff's request to repeal

7  his gang validation, and explained to Plaintiff that he presented no compelling evidence or otherwise

8  substantiated his claim that his gang validation was incorrect.  (Cattermole, Ex. K, AGO-288-299.)

9  Since that time, correctional staff has observed Plaintiff passing written notes to other inmates and

10 swallowing the notes after reading them.  (Cattermole, Ex. I, AGO-259.)  A search of Plaintiff's cell

11 revealed two written items, upon which were drawn inmate gang symbols.  (Cattermole, Ex. I, AGO-

12 261-263.)  Also, two confidential memoranda dated May 19, 2003, and May 23, 2003, indicated

13 Plaintiff planned to batter another inmate as part of a gang related conspiracy.

14 **B.     Procedural Background**

15      On September 10, 2003, Plaintiff filed a complaint under 42 U.S.C. § 1983.  Plaintiff asserts

16 substantive due process violations under the Fourteenth Amendment, arguing that his gang validation

17 and subsequent Grade B classification violated both his First Amendment right to associate and his

18 protected liberty interest as a prisoner in avoiding atypical and significant hardship.  Plaintiff also

19 asserts procedural due process violations, arguing that his validation as a gang member by prison

20 officials was based upon insufficient evidence, indeterminate standards, and that Plaintiff did not

21 have an opportunity to contest the evidence.  Plaintiff also asserts a procedural due process claim

22 arguing that this validation effectively relegates him to indefinite Grade B status since he contends

23 that it is extremely difficult to overcome the presumption of gang association once having been

24 validated as a gang member.

25

26                              **LEGAL STANDARD**

27      Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment if there is

28 no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of

4

United States District Court

For the Northern District of California

law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of demonstrating the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file that establish the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets this initial burden, the burden then shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Id.* at 247-48. An issue of fact is material if, under the substantive law of the case, resolution of the factual dispute might affect the case's outcome. *Anderson*, 477 U.S. at 248. Factual disputes are genuine if they "properly can be resolved in favor of either party." *Id.* at 250. Thus, a genuine issue for trial exists if the non-movant presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in its favor. *Id.* However, "[i]f the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).

## ANALYSIS

**A.      Substantive Due Process Violation for Atypical Hardship**

Plaintiff argues that his gang validation and subsequent Class B classification amount to a substantive due process violation under the Fourteenth Amendment. The Due Process Clause prohibits states from "depriving any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. To determine whether a state has violated the Fourteenth Amendment's Due Process Clause with respect to a liberty issue, a court must engage a two-part analysis. As a threshold issue, the court must determine whether a liberty interest, protected by the Fourteenth Amendment, is implicated by Plaintiff's Class B classification. *Wilkinson v. Austin,* 545 U.S. 209, 125 S.Ct. 2384, 2393 (2005); *Sandin v. Conner,* 515 U.S. 472 (1995). Only if such an interest is implicated, must a court determine whether sufficient procedural and evidentiary safeguards were in place to protect that interest. *Wilkinson,* 125 S.Ct. at 2393; *see also, Ky. Dep't of Corr. v. Thompson,*

5

United States District Court

For the Northern District of California

1   490 U.S. 454, 460 (1989); *see also, Zimmerlee v. Kenney,* 831 F.2d 183, 186 (9th Cir. 1987).

2   "Those who seek to invoke [the] procedural protection [of the Fourteenth Amendment] must

3   establish that [an] interest[] is at stake." *Wilkinson*, 125 S.Ct. at 2393.  Defendants contend that

4   Plaintiff's Grade B classification does not implicate a liberty interest protected by the Fourteenth

5   Amendment. A liberty interest may derive from two points:  the Constitution itself or "it may arise

6   from an expectation or interest created by state laws or policies . . . ." *Id.*; *see also Wolf v.*

7   *McDonnell*, 418 U.S. 539, 556-58 (1974).  The Supreme Court "[has] held that the Constitution itself

8   does not give rise to a liberty interest in avoiding transfer to more adverse conditions of

9   confinement." *Wilkinson*, 418 U.S. at 2393.  Nonetheless, "a liberty interest in avoiding particular

10  conditions of confinement may arise from state policies or regulations . . . ." *Id.*

11

12      **1.      Plaintiff's Liberty Interest in Avoiding Class B Classification**

13      As a threshold issue, Plaintiff must establish that he has a protected liberty interest.[4]

14  Accordingly, the Court will first examine whether Plaintiff's assignment from Grade A to Grade B

15  status gives rise to a protected interest. It is undisputed that Plaintiff's conviction authorized the state

16  to impose certain  restrictions on Plaintiff's confinement.  *See, e.g., Meachum v. Fano*, 427 U.S. 215,

17  225 (1976).  However, certain restrictions may implicate a protected liberty interest if they "[impose

18  an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison

19  life." *Jackson v. Carey*, 353 F.3d 750, 755 (9th Cir. 2003); *Sandin at* 484.  In determining whether

20  disciplinary segregation imposes atypical and significant hardship, a court considers the following

21  factors:  1) whether disciplinary segregation was essentially the same as discretionary forms of

22  segregation; 2) whether a comparison between the plaintiff's confinement and conditions in the

23

---

24      [4]Plaintiff argues that California Code of Regulations creates a liberty interest in inmate privileges because it defines
    such privileges as "administratively authorized activities and benefits required of the director, by statute, case law,
25  governmental regulations, or executive orders" and therefore requires prison officials administer these privileges. 15 CCR
    § 3044(c). The Court is unpersuaded by this argument. The Supreme Court has explicitly disavowed the methodology of
26  identifying state-created liberty interests by focusing on  'the language of a particular [prison] regulation' instead of 'the
    nature of the deprivation.' *Wilkinson v. Austin,* 125 S.Ct. 2384, 2394 (2005). This is precisely the methodology that Plaintiff
27  urges the Court to apply here. The Supreme Court stated, "[a]fter *Sandin*, it is clear that the touchstone of the inquiry into
    the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language
28  of regulations regarding those conditions but the nature of those conditions themselves 'in relation to the ordinary incidents
    of prison life.' *Id.*

1    general population shows that the plaintiff suffers a major disruption in his environment; and 3)

2    whether the length of the plaintiff's sentence was affected. *Sandin*, 515 U.S. at 486-87; *Jackson*, 353

3    F.3d at 755;  *Resnick v. Hayes*, 213 F.3d 443, 448 (9th Cir. 2000).[5]  Such an inquiry requires a "case

4    by case, fact by fact consideration." *Jackson*, 353 F.3d at 755 (quoting *Keenan v. Hall*, 83 F.3d

5    1083, 1089 (9th Cir. 1996)).

6            Plaintiff asserts that his Grade B classification imposes an atypical and significant hardship

7    on him because the Grade B classification substantially impairs some of the privileges and liberties

8    that Grade A inmates receive.  The parties primarily focus on three cases and dispute whether

9    Plaintiff's classification imposes a major disruption in his environment.[6]  These cases are:

10   *Wilkinson*, 125 S.Ct. 2384 (2005); *Koch v. Lewis*, 216 F. Supp. 2d 994 (D. Arizona 2001), *vacated*

11   *as moot*, 399 F.3d 1099 (9th Cir. 2005); and *Madrid v. Gomez*, 889 F. Supp. 1146 (N.D. Cal. 1995).

12   Specifically, Plaintiff points to the fact that, because he now has Grade B status, he cannot make

13   telephone calls or receive contact visits; he receives 10 hours per week in the exercise yard, as

14   opposed to 42 hours for Grade A inmates; his canteen access is limited to $45 per month of non-

15   nutritious food, as opposed to $180 per month for nutritious food; he is allowed one, as opposed to

16   four, thirty-pound package of food from home every year; he cannot possess typewriters, tape

17   players, or water heaters; he cannot purchase nutritional supplements or razors from outside sources;

18   his surroundings are noisier, more violent, and more grim than Grade A surroundings; and he cannot

19   "embrace his wife."[7]  (Complaint at ¶4.)  Defendants contend that Plaintiffs allegations do not

20   amount to a significant and atypical hardship within the meaning of *Sandin* and, thus, Plaintiff has

21   failed to establish a triable issue of material fact.  The Court agrees.  The cases to which Plaintiff

22   cites in support of his argument involve deprivations significantly harsher than those that Plaintiff

---

24   [5]The *Wilkinson* court noted that any one of the three factors, standing alone, may not create a liberty interest.  125
25   S.Ct. at 2394-95.  A court, however, must consider the factors as a whole to determine whether the imposed conditions impose
     a typical and significant hardship on the prisoner.  *Id.* at 2395.

26   [6]Neither party addresses the issues of whether the disciplinary segregation was essentially the same as discretionary
27   forms of segregation and whether the length of Plaintiff's sentence was affected.  The record is bare with respect to the first
     issue.  The record does indicate, however, that Plaintiff's Grade B status did not affect his sentence, as Plaintiff was (and is)
28   on Death Row.  Accordingly the Court finds no genuine issue of material fact with respect to those issues.

     [7]Defendants do not deny the conditions imposed on Grade B inmates.

United States District Court

For the Northern District of California

1   has experienced due to Class B certification.  They are distinguishable from the instant case on that

2   basis.

3          In *Wilkinson*, the Supreme Court found that there was a liberty interest in avoiding

4   confinement in the Ohio State Penitentiary ("OSP").  OSP is a "Supermax" facility.[8]  *Wilkinson*, 125

5   S.Ct. at 2394. OSP prisoners were subject to the following conditions:  inmates had to remain in

6   their 7 x 14 foot cells for 23 hours per day; during the one hour each day an inmate was permitted to

7   leave his cell he was restricted to one of two indoor recreation areas; a dimmed light had to remain

8   on in the cell at all times, and inmates who attempted to shield the light were punished; inmates

9   could not in any way communicate with other inmates; any visitation was rare and conducted

10  through glass walls; and placement was indefinite.  *Id.* at 2389.  The court held that such

11  confinement imposed an atypical and significant hardship, however, because placement at OSP was

12  1) indefinite and reviewed only annually and 2) disqualified an inmate for parole consideration.  *Id.*

13  at 2394-95.

14         Here, the restrictions of Plaintiff's Class B privileges and living conditions are not

15  particularly severe in comparison to those at issue in *Wilkinson*.  Plaintiff is allowed forty-five

16  dollars a month for spending on supplemental foods, receives ten hours per week in the yard, and is

17  allowed a thirty-pound package of additional food from home each year.  Unlike OSC inmates,

18  Plaintiff is not kept in solitary confinement. Moreover, Plaintiff's Grade B classification is reviewed

19  every ninety days, and thus is not indefinite.[9]  Additionally, Plaintiff is on death row, and will

20  presumably live out the rest of his life on such; his Grade B classification does not alter his sentence.

21   Even viewed in the light most favorable to Plaintiff, the imposed restrictions do not work an atypical

22  and significant hardship in relation to the ordinary incidents of prison life.

23         Similarly, the instant case is distinguishable from *Koch*.  *Koch* involved an inmate who was

24  housed in Special Management Unit II (SMU II) of the Arizona Department of Corrections, which, at

25  ───────────────────

26         [8]"Supermax" prisons are maximum security facilities with highly restrictive conditions.

27         [9]Although Plaintiff argues that his classification as a gang member is essentially indefinite because it is "nearly
    impossible" to overcome the presumption of gang association once having been validated, Plaintiff has presented no
    competent evidence indicating that the system does not seriously take into account exonerating evidence, or that Plaintiff
28  himself has presented exonerating evidence that was ignored.  Accordingly, the Court grants summary judgment in favor of
    Defendants as to this argument.

United States District Court

For the Northern District of California

the time, was the most restrictive confinement in the state and the most secure Supermax facility in the United States. 216 F. Supp. 2d at 996-97. Koch was placed at SMU II after being validated as a member of the Aryan Brotherhood prison gang. *Id.* at 996. There he had to remain in his 10 x 8 foot cell nearly 24 hours a day; was allowed one hour every other day (three hours per week) in which to shower and exercise; could only see the sky or sunlight through a mesh grate ceiling in the exercise area; was shackled during that one hour when he was permitted to leave the cell; could make one phone call per week; and was allowed no more than two hours of visitation time per week through a plate glass window. *Id.* at 997. Additionally, although Koch's sentence was 25 years to life, his status as a previous gang member effectively foreclosed him from any possibility of parole. *Id.* at 999. Koch had been in the SMU II and under these conditions for five and a half years and would probably have continued to remain there for the rest of his life due to SMU II release procedures. *Id.* The district court held that such conditions implicated a liberty interest because "the deprivation [was] extreme in both degree and duration." *Id.* at 1000. There the court expressed its concern over the unlimited duration of Koch's confinement in such conditions but noted that "[a] short stay under the severe conditions of SMU II may not raise due process concerns."[10] *Id.* at 1001. Here, as discussed above, not only are Plaintiff's conditions as a Grade B inmate less severe than those imposed at SMU II, but Plaintiff's Grade B classification is up for review every ninety days.

Finally, the Court distinguishes *Madrid*. *Madrid* involved a class action where inmates of the Security Housing Unit ("SHU") of PBSB alleged, *inter alia*, that, pursuant to a 42 U.S.C. § 1983 claim, their confinement in the SHU imposed on them inhumane conditions. *Madrid*, 889 F. Supp. at 1156. There, in addition to being physically assaulted, plaintiffs were confined to windowless, white-walled cells designed to reduce visual stimulation; inmates could spend years without ever seeing the outside world; they received little normal human contact, less than other Supermax facilities; and plaintiffs suffered from mental deterioration as a result of their confinement conditions. *Id.* at 1228-30. The district court found that such conditions violated the Eighth Amendment, but only with respect to certain subgroups of SHU inmates, including the mentally ill.

---

[10]The Ninth Circuit recognized in *Sealey v. Giltner* that "harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." 197 F.3d 578, 586 (9th Cir. 1999).

*Id.* at 1279. In the instant case the conditions imposed on Plaintiff are not nearly as atypical or severe.

"[T]he Due Process Clause does not protect every change in the conditions of confinement having a substantial adverse impact on the prisoner." *Sandin,* 515 U.S. at 478. As described above, the restrictions Plaintiff faces as a Grade B inmate are significantly less harsh than in the cases Plaintiff cites. Moreover, these restrictions are for a far shorter time period since a review of a prisoner's Grade B status occurs every 90 days. Accordingly, the Court finds that Plaintiff's classification as a Grade B inmate does not implicate a protected liberty interest since it does not significantly disrupt his environment or impose an atypical or significant hardship that rises to the level of a constitutional violation. Since Plaintiff has not established a constitutional violation on this basis, the Court need not consider Plaintiff's procedural due process claim.[11] See *Pichardo v. Kinker,* 73 F.3d 612 (5th Cir. 1996); *Sandin* at 485-86.

**B.     First Amendment–Freedom Of Association**

Plaintiff asserts that his Grade B status violates his First Amendment right to associate, citing to, *inter alia*, *Jones*. Plaintiff argues that the regulations restricting Plaintiff's right to associate should be analyzed under a "strict scrutiny" standard by the Court. The Court disagrees. The Supreme Court has held that "[c]hallenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law." *Jones v. North Carolina Prisoner's Labor Union*, 433 U.S. 119, 125 (1977)

---

[11]Although the Court does not need to reach Plaintiff's procedural due process claims, the Court notes that, in any event, Defendants have met the evidentiary standard in the Ninth Circuit with respect to Plaintiff's gang validation. "California's policy of assigning suspected gang affiliates to the Security Housing Unit is not a disciplinary measure, but an administrative strategy designed to preserve order in the prison and protect the safety of all inmates." *Bruce v. Ylst,,* 351 F.3d 1283, 1287 (9th Cir. 2003). "Although there are some minimal legal limitations...the assignment of inmates within the California prisons is essentially a matter of administrative discretion...[T]he relevant issue is whether there was 'some evidence' to support [the] validation." *Id.* Defendants presented considerable evidence in support of their validation of Plaintiff as a gang member, including documents discovered in Plaintiff's possession containing the names and contact information of known gang members, evidence from multiple confidential sources affirming that Plaintiff ordered at least one gang-related prison attack, and evidence that Plaintiff's conviction for murder was related to his gang activities. Accordingly, the Court finds that Defendants have presented "some evidence" to support Plaintiff's validation as a gang member. *Id.*

United States District Court

For the Northern District of California

1    (quoting *Pell v. Procunier*, 417 U.S. 817, 822 (1974)).

2        In *Jones*, the North Carolina Department of Correction created regulations that barred, among

3    other things, union meetings. *Id.* at 121.  The union brought suit in district court challenging the

4    regulations and alleging a First Amendment violation for the no-meeting rule. *Id.*  The district court

5    held for the union and issued an injunction. *Id.* at 126.  The Supreme Court, however, reversed,

6    finding that the district court failed to give proper deference to the decisions of prison officials with

7    respect to potentially dangerous situations. *Id.* at 125.  The *Jones* court held that with respect to First

8    Amendment associational rights, courts must give way to the difficult realities of the prison system,

9    which include violence and confrontation among inmates and employees. *Id.* at 126.  The court

10   stated:

11           First Amendment associational rights . . . must give way to the reasonable
             considerations of penal management. . . .  Prison life and relations between the
12           inmates themselves and between the inmates and prison officials or staff,
             contain the ever-present potential for violent confrontation and conflagration.
13           Responsible prison officials must be permitted to take reasonable steps to
             forestall such a threat, and they must be permitted to act before the time when
14           they can compile a dossier on the eve of a riot. . . .  When weighed against the
             First Amendment rights asserted, these institutional reasons are sufficiently
15           weighty to prevail.

16   *Id.* at 132-33.  The *Jones* court found that the prison officials had legitimate policies and goals

17   warranting the restriction of union meetings; particularly important was the motive to eliminate

18   friction between inmate and prison personnel, as well as friction between union and non-union

19   inmates. *Id.* at 125-27.  Accordingly the *Jones* court did not find a violation of the plaintiff's First

20   Amendment associational rights. *Id.* at 133.

21       Here, Defendants have equally legitimate, if not more pressing, policy reason for placing

22   dangerous inmates, particularly members of prison gangs, in Grade B facilities.  Prison officials

23   restrict gang association because it almost inevitably leads to violence and friction among the

24   inmates and prison employees.  Given Plaintiff's prison affiliation with the Aryan Brotherhood,

25   coupled with his violent criminal past in connection with the gang, the Court finds that Defendants

26   had legitimate policy reasons and goals in limiting Plaintiff's ability to associate with other gang

27   members by classifying him as a Grade B inmate. *See, e.g., Stefanow v. McFadden*, 103 F.3d 1466,

28   1472-73 (9th Cir. 1996) ("Anyone familiar with prisons understands the seriousness of the problems

*United States District Court*

*For the Northern District of California*

United States District Court

For the Northern District of California

1   caused by prison gangs that are fueled by actively virulent racism . . . .   The security concerns of

2   prison officials are entitled to respect and deference by the courts."); *Hart v. Cambra*, 1997 WL

3   564059, at *7 (N.D. Cal. Aug. 22, 1997) ("To the extent the placement and retention of inmates in

4   [segregated facilities] as gang affiliates is due to the exercise of their First Amendment rights of

5   communication with other persons identified as gang affiliates, the infringement on the constitutional

6   right of the affected prisoners is permissible."); *Koutnik v. Brown*, 2005 WL 552192, at *2 (W.D.

7   Wis. Mar. 2, 2005) ("It is beyond question that prison officials have a compelling interest in

8   implementing policies designed to combat the threat to institutional security posed by organized

9   gang activity.").   Accordingly, the Court finds Plaintiff has not raised any genuine issue of material

10  fact with respect to his First Amendment claim.[12]

**CONCLUSION**

12          For the foregoing reasons the Court **GRANTS** Defendants' Motion for Summary Judgment

13  with respect to Plaintiff's  42 U.S.C. § 1983 claim as Defendants are entitled to judgment as a matter

14  of law.[13]   The Clerk of the Court is instructed to close the file.

15  **IT IS SO ORDERED.**

16

17

18  Dated: August___18___, 2006

                                                 _____
19                                               MARTIN J. JENKINS
                                                 UNITED STATES DISTRICT JUDGE
20

21

22          [12]Plaintiff also argues that the rules regarding Grade B classification are impermissibly vague in violation of his First
    Amendment rights.  Plaintiff contends that the rules "[f]ail to give inmates adequate notice of what conduct is proscribed and
23  what conduct is prohibited...delegate unbridled discretion to defendants...lack sufficient reasonable minimal standards to
    guide defendants in fairly judging whether plaintiff is truly a prison gang associate." Complaint ¶ 23. However, as noted
24  above, the decision to house inmates in one location as part of an "administrative strategy designed to preserve order in the
    prison and protect the safety of all inmates...is essentially a matter of administrative discretion." *Bruce v. Ylst*, 351 F.3d 1286-
25  7.  Moreover, Plaintiff's validation as a gang member requires "some evidence" that Plaintiff is involved with other gang
    members for the purposes of promoting gang activity. *Id.*  Prisoners are thus on notice that engaging in gang activity or
26  associating with known gang members for the purposes of furthering gang activity, is prohibited.  Accordingly, given the
    discretionary nature of such a decision, and the requirement that Plaintiff's gang validation be supported by evidence of
27  engagement in gang activity, the Court finds that the rules guiding this decision are not unconstitutionally vague.

28          [13]Docket No. 17, filed on July 1, 2005.

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28